**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:12-cv-00125-MR
(CRIMINAL CASE NO. 1:09-cr-00013-MR-9)**

| | |
|---|---|
| **YVONNE MARIE FOUNTAIN,** )<br>)<br>**Petitioner,** )<br>)<br>**vs.** )<br>)<br>**UNITED STATES OF AMERICA,** )<br>)<br>**Respondent.** )<br>_____ ) | **MEMORANDUM OF<br><u>DECISION AND ORDER</u>** |

**THIS MATTER** is before the Court on the Order of the Court of Appeals for the Fourth Circuit [CV Doc. 34][1] remanding this matter for an evidentiary hearing on Petitioner's claim of ineffective assistance of counsel as asserted in her motion to vacate pursuant to 28 U.S.C. § 2255, as amended [CV Docs. 1, 5]. The Court held an evidentiary hearing on February 9, 2016.

## I. FACTUAL BACKGROUND

The Asheville Police Department began conducting surveillance of Petitioner's residence in the summer of 2007. Officers later searched the

_____

[1] Citations to the record herein contain the relevant docket number preceded by either the letters "CV" denoting that the document is listed on the docket in the civil case file number 1:12-cv-00125-MR, or the letters "CR" denoting that the document is listed on the docket in the criminal case file number 1:09-cr-00013-MR-9.

trash from the residence that Petitioner shared with her boyfriend and co-defendant Dennis Bruton and found clear plastic bags with cocaine residue on them. [CR Trial Tr. at 553-55]. In August 2008, while Detective Jeffrey Rollins was conducting surveillance of Petitioner's residence, he saw Petitioner leave her residence and get into a gray Infiniti parked outside of her home. [Id. at 558-59]. Petitioner sat in the car for approximately two minutes and then "exited the vehicle with a large amount of U.S. currency in her left hand." [Id. at 559]. On that same date, Petitioner's co-defendant Kenneth Foster was seen by officers at Petitioner's and Bruton's residence. [Id. at 559-60].

Having learned that Foster's supply source would be delivering cocaine to Foster on February 5, 2009, officers obtained search warrants for Foster's residence and Petitioner's and Bruton's residence, executing both warrants on the night of February 5, following that delivery. [Id. at 398-99]. During the search of Foster's residence, agents seized large quantities of currency from Foster's jacket pockets, 31.7 grams of powder cocaine on the stove, half a kilogram of powder cocaine on top of the refrigerator, and four, individually wrapped bags containing a total of 156.6 grams of crack cocaine on the stove, among other items. [Id. at 399, 403, 607, 609-11, 614].

At approximately the same time officers were executing a search at Foster's residence, other officers searched the residence of Petitioner and Bruton. [Id. at 560]. During the search, agents conducted a forcible entry after unsuccessfully trying to gain entry upon request. [Id. at 562]. Numerous people were in the home, and when agents came to Petitioner's and Bruton's bedroom door, it was blocked. [Id.]. Officers ultimately gained entry to the bedroom. After noticing another door and kicking it open, officers saw Petitioner standing in her pajamas next to the toilet. [Id. at 563-66]. Officers found approximately 76 grams of crack cocaine on the toilet seat, in the toilet, and on the floor beside the toilet. [Id. at 569-70, 619, 621-22]. Additionally, officers seized from the bedroom approximately $21,000 in cash and digital scales with cocaine residue. [Id. at 570-71]. Officers also seized a power bill in Petitioner's name. [Id. at 572].

## II.   PROCEDURAL BACKGROUND

Petitioner was initially charged by way of a criminal complaint on February 6, 2009. [CR Doc. 1]. At her initial appearance on the criminal complaint, Petitioner requested the appointment of counsel, and the Magistrate Judge appointed Assistant Federal Defender Fredilyn Sison to represent her. [See Oral Order of Feb. 6, 2009]. On February 17, 2009, Petitioner was charged, along with fourteen co-defendants, in a Bill of

Indictment with conspiracy to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count One); and using a communication facility in committing and in causing and facilitating the drug conspiracy, in violation of 21 U.S.C. § 843(b) (Count Two). [CR Doc. 12: Indictment].

On March 3, 2009, Ms. Sison was granted leave to withdraw from representation of Petitioner on the grounds that Petitioner had retained private counsel, Jack Stewart. [See CR Docs. 114, 116, 128]. On March 30, 2009, the Government filed an Information pursuant to 21 U.S.C. § 851 ("§ 851 Notice") setting forth Petitioner's previous conviction for a felony drug offense. [CR Doc. 153]. On April 21, 2009, Mr. Stewart moved to withdraw as Petitioner's attorney on the grounds that Petitioner refused to communicate him and had told him that she had retained new counsel. [CR Doc. 189]. On May 12, 2009, the Magistrate Judge entered an Order allowing Mr. Stewart to withdraw and ordered Petitioner to advise her new counsel to file a notice of appearance immediately. [CR Doc. 229]. Thereafter, on May 26, 2009, attorney Sherlock Grigsby filed a notice of appearance on behalf of Petitioner. [CR Doc. 236].[2]

_____

[2] Because Mr. Grigsby is not a member of the North Carolina bar or the bar of this Court, he sought admission *pro hac vice*, which the Court granted. [CR Docs. 235, 237].

On June 19, 2009, the parties filed a Plea Agreement signed by counsel for the Government, Petitioner, and her counsel. [CR Doc. 250]. Pursuant to the Plea Agreement, Petitioner agreed to plead guilty to Count One of the Bill of Indictment. In exchange for Petitioner's guilty plea, the Government agreed to dismiss Count Two of the Bill of Indictment at the appropriate time. [Id.].

A Rule 11 hearing was scheduled before the Magistrate Judge on June 29, 2009. Petitioner appeared at the hearing with Mr. Grigsby. At the very beginning of the hearing, Mr. Grigsby requested an opportunity to speak with Petitioner in private. [CR Doc. 765 at 3]. When Petitioner and Mr. Grigsby returned to the courtroom, Mr. Grigsby announced to the Court that Petitioner "has decided to withdraw the plea . . . . At this point, she plans to go forward with trial." [Id. at 7].

Petitioner was tried along with co-defendant Bruton and Foster before a jury beginning on July 6, 2009, with the Honorable Lacy H. Thornburg presiding.[3] Following the presentation of the Government's case, Petitioner moved for judgment of acquittal based on the insufficiency of the evidence. [Id. at 653-57, 759-60]. The Court denied Petitioner's motion as to Count

---

[3] Following Judge Thornburg's retirement in 2009, this case was assigned to the undersigned.

One, but granted the motion with respect to Count Two based on the Government's concession that there was no evidence of Petitioner's use of a communication facility during commission of the drug conspiracy. [Id. at 655-56].

At the conclusion of four days of testimony, the jury found Petitioner guilty of the drug conspiracy offense. [CR Doc. 297: Fountain Verdict]. The jury also found that possession with intent to distribute more than 50 grams but less than 150 grams of crack cocaine was reasonably foreseeable to her as a member of the conspiracy. [Id. at 1-2].

Following the jury's verdict, the Probation Office prepared a Presentence Report ("PSR"). The probation officer calculated Petitioner's total offense level to be 30 and her criminal history category to be I. Based on this total offense level and criminal history category Petitioner's guidelines range would have been 97-121 months. [CR Doc. 306 at 6; 11: PSR]. Petitioner, however, faced a statutory mandatory minimum term of imprisonment of 240 months in light of her prior felony drug trafficking conviction. See 21 U.S.C. § 851. Therefore, her applicable guidelines range was the mandatory minimum of 240 months. U.S.S.G. § 5G1.1(b). The Court ultimately sentenced Petitioner to 240 months' imprisonment, the statutory mandatory minimum. [CR Doc. 349: Judgment].

Petitioner appealed, arguing on appeal that the evidence was insufficient to support her conviction for participation in the charged conspiracy; that the Court abused its discretion in denying her motion to sever her trial from the trial of her co-defendants; and that the evidence did not support the jury's finding of a single conspiracy. The Fourth Circuit affirmed the Court's judgment on March 14, 2011. United States v. Fountain, 416 F. App'x 304 (4th Cir. 2011). Petitioner then filed a petition for writ of certiorari with the Supreme Court, which petition was denied on October 17, 2011. Fountain v. United States, 132 S.Ct. 218 (2011).

Eight months later, on June 4, 2012, Petitioner filed the original motion to vacate her conviction and sentence under 28 U.S.C. § 2255, asserting twenty-nine issues and five grounds for relief. [CV Doc. 1]. On October 22, 2012, Petitioner filed a motion to amend her motion to vacate, stating that of the twenty-nine issues and five grounds for relief in her original motion to vacate, she had narrowed the motion to vacate to fourteen issues and two grounds for relief. [CV Docs. 5, 6]. In pertinent part, Petitioner claimed that Mr. Grigsby failed to explain to her that the Government had filed a notice in accordance with 21 U.S.C. § 851, that it would seek enhanced penalties based on Fountain's prior drug-trafficking conviction, and that this notice would result in a mandatory-minimum sentence of 20 years in prison. [CV

Doc. 6 at 6-8]. Petitioner also asserted that Mr. Grigsby had a conflict of interest during his representation of her, because of his friendship with Foster's counsel. [Id. at 15-16].

The Court ordered the Government to respond to Petitioner's motion to vacate [CV Doc. 7], and on May 6, 2013, the Government filed a motion for summary judgment seeking a dismissal of Petitioner's motion. [CV Doc. 14].[4] In support of its summary judgment motion, the Government submitted an affidavit from Mr. Grigsby, which states, in pertinent part, as follows:

> I explained the Government's plea offer in length with Ms. Fountain. I explained to her that were she to be convicted she would face a mandatory twenty year sentence in light of her previous conviction and the Government's 851 notice. I made numerous trips from DC to Asheville in order to visit Ms. Fountain personally. I personally advised Ms. Fountain of the Government's 851 notice and discussed in detail with her the facts of her previous conviction. I explained to her that per the terms of the Government's plea offer the government would withdraw the 851 notice if she were to accept the plea offer.[5] I explained to her that per the plea offer she would face a mandatory minimum of ten years rather than the potential twenty years if she were to be convicted. I explained this in detail on every visit with Ms. Fountain. On at least one occasion Attorney Kevin

---

[4] The Government subsequently filed a corrected version of this motion. [CV Doc. 15].

[5] While Mr. Grigsby testified that the Government had agreed to withdraw the § 851 Notice upon Petitioner pleading guilty, the Court notes that there is no reference made in the Plea Agreement to any such agreement. The Government does not appear to dispute, however, that there was such an agreement between the parties. [See Doc. 42 at 5].

McCants was present when I discussed Ms. Fountain's legal options.

            \*      \*      \*

I did not seek a competency hearing for Ms. Fountain. Ms. Fountain never requested one, and I did not observe anything that would lead me to independently request a competency hearing. The decision to go to trial was Ms. Fountain's decision. After many trips to visit Ms. Fountain as well as a partial plea hearing, Ms. Fountain decided to go to trial.

[Doc. 13-1: Grigsby Aff. at 1-2].

Petitioner filed a response to the Government's Motion, attaching to her response an affidavit in which she asserted that Mr. Grigsby "never explained to [her] what a plea was" and that he had offered her no advice prior to her plea. [CV Doc. 24 at 28]. Petitioner further stated in her affidavit that she recalled Mr. Grigsby telling her "that they [were] not going to use the prior against her" but that this statement was "all she remember[ed]." [Id.].

On January 21, 2014, this Court entered an Order denying Petitioner's motion to vacate. Specifically, the Court concluded that Petitioner had failed to present a forecast of evidence that Mr. Grigsby's conduct in advising her regarding the plea offer and the effect of the § 851 Notice fell outside of the range of reasonable professional assistance. [CV Doc. 28 at 12-14].

Petitioner appealed. [CV Doc. 30]. The Fourth Circuit Court of Appeals granted a limited certificate of appealability solely on the issue of whether

this Court erred by denying, without an evidentiary hearing, Petitioner's claim that counsel rendered ineffective assistance during plea negotiations. [No. 14-6288, Doc. 5]. While the matter was pending before the Fourth Circuit, the Government, upon reconsideration of the matter, moved to remand the case for the limited purpose of asking the Court to conduct an evidentiary hearing on Petitioner's ineffective assistance claim. [Id., Doc. 46].[6] The Fourth Circuit granted the Government's motion and remanded the case to this Court on October 16, 2015. [CV Doc. 34].

On February 9, 2016, this Court conducted an evidentiary hearing. Petitioner was represented at the hearing by attorney Eric J. Foster. Mr. Grigsby testified at the hearing that he was retained by Petitioner's family in early May 2009 to represent her following her dissatisfaction with her two prior court-appointed attorneys. [CV Doc. 39 at 29; see also id. at 60, 70]. According to Mr. Grigsby, Bruton was represented by Mr. Grigsby's friend and colleague, Kevin McCants, and Mr. McCants had recommended Mr.

---

[6] The Government's Motion to Remand erroneously states that the Fourth Circuit granted a certificate of appealability on two issues : (1) whether the district court erred by denying, without an evidentiary hearing, Petitioner's claim that her trial counsel rendered ineffective assistance by failing properly to advise her during plea negotiations and (2) whether the district court erred by denying, without an evidentiary hearing, Petitioner's claim that her trial counsel represented her while under a conflict of interest. [See id., Doc. 46 at 1]. At the subsequent evidentiary hearing, counsel for both parties stated their understanding on the record that the only issue to be considered on remand was the ineffective assistance claim based on counsel's performance during plea negotiations.

Grigsby to Petitioner's family. [Id. at 8; see also id. at 52]. Mr. Grigsby testified at the hearing that at no time during his representation of Petitioner did he learn that she had any limited ability to comprehend or any "learning limitations." [Id. at 17]. Mr. Grigsby also testified that no family member ever brought any such limitations to his attention and that, "based on [his] observations, there was nothing that stood out as . . . appearing to be a learning disorder." [Id. at 17-18].

Concerning the advice he provided to Petitioner about whether or not to accept the Government's plea offer, Mr. Grigsby testified that he visited Petitioner shortly before the deadline for accepting the Government's offer and discussed the proposed plea agreement "in detail." [Id. at 19]. Mr. Grigsby testified that he spent "quite a bit of time" with Petitioner. [Id.]. Mr. Grigsby testified also that he explained to Petitioner, before she signed the plea agreement and again on the day of her Rule 11 hearing when she decided to withdraw her plea, that if she declined to plead guilty, she would face a mandatory-minimum term of 20 years in prison. [Id. at 16, 41-43]. Mr. Grigsby testified that he also advised Petitioner that if she pleaded guilty, "the mandatory minimum, per the plea agreement, would be ten years rather than 20 years." [Id. at 16]. Mr. Grigsby testified that he explained these consequences to Petitioner "at every meeting several times." [Id. at 16; see

11

also id. at 18 ("Every time I spoke with Ms. Fountain, that was brought up and discussed at every meeting.")].  Mr. Grigsby testified that he also explained these consequences to Petitioner's sister and possibly to her father.  [Id.].

Mr. Grigsby testified that, during the meeting in which Petitioner signed the Plea Agreement, he reviewed the Government's evidence of Petitioner's guilt with her; that he also explained to Petitioner the breadth of conspiracy under federal law; and that, because she was found in close proximity to crack cocaine, the likelihood of a guilty verdict, if she proceeded to trial, was "fairly high."  [Id. at 20-21, 36-38].  Mr. Grigsby explained that he told Petitioner that the guilty plea was an option and he "gave her the information . . . [about] what was probably going to happen given her decision either way."  [Id. at 21].

Mr. Grigsby testified that the Rule 11 hearing was terminated when Petitioner became upset and "confided to [him] that she couldn't plead to something she didn't do."  [Id. at 23; see also id. at 15 ("[S]he broke down in tears and said I can't do it.  She said I can't sign something I didn't do.")].  He further testified that she had repeatedly denied to him having any role in the conspiracy.  [Id. at 36 ("[S]he kept saying I didn't do anything.  I didn't sell any drugs.")].

Petitioner's sister, Kim Fountain, testified at the hearing that Petitioner had a learning disability and that "she was always in special classes in school." [Id. at 51]. Ms. Fountain testified that she told Mr. Grigsby that he needed to explain things to Petitioner as if she were a five-year-old because "there's a lot of stuff" Petitioner did not understand. [Id. at 54]. Ms. Fountain also testified that Mr. Grigsby informed her when Petitioner signed the plea agreement, explaining that the Government was offering Petitioner "ten years." [Id. at 55].

Petitioner also testified at the hearing. [Id. at 58]. Petitioner testified that she did not recall whether her first attorney, Fredilyn Sison, showed her the Government's evidence against her or a proposed plea agreement and that her second attorney, Jack Stewart, encouraged her to cooperate with the Government but did not share the Government's discovery with her. [Id. at 70, 72, 77, 78]. Petitioner testified that Mr. Stewart grew frustrated with her and that her co-defendant, Doris Foster, wrote a letter requesting new counsel for Petitioner. [Id. at 72-73]. When Petitioner was asked whether she told Doris Foster what to put in the letter, Petitioner responded that she did not tell Doris Foster what to write and did not know what was in the letter when she gave it to Mr. Stewart. [Id. at 74].

Petitioner testified that she recalled meeting with Mr. Grigsby after her family hired him to represent her but that he did not "talk to [her] about conspiracy," did not discuss with her the mandatory sentence she faced as a result of the § 851 Notice, and did not discuss the Government's evidence against her, stating that she only "[saw] the evidence when [she] was in trial." [Id. at 61, 68, 77]. Petitioner testified that she explained to Mr. Grigsby that she did not understand some of what he explained to her and that he would need to "break stuff down." [Id. at 79-80].

Petitioner recalled signing her plea agreement and testified that she did so because "people in the jail . . . said you can't beat the Feds" and because "[Mr. Grigsby] asked [her] to sign it." [Id. at 62-63, 78, 80]. Petitioner, who acknowledged that she had had prior experience with the court system[7], testified that she did not read the agreement or ask any questions before she signed it and that, while she intended to plead guilty, she did not know what a conspiracy was when she signed the agreement. [Id. at 63, 80-82]. According to Petitioner, she did "not really" know why she was brought to court on the day of her aborted Rule 11 hearing. [Id. at 63]. Petitioner testified that she broke down during the Rule 11 hearing and

_____

[7] Petitioner was convicted on or about April 27, 2000 for the sale and delivery of cocaine in the Superior Court of Buncombe County, North Carolina. [See CR Doc. 153: 851 Notice].

thought she was taken to a holding cell to compose herself and then to return to the courtroom, but that Mr. Grigsby "never ended up coming back." [Id. at 65, 68, 85].

Petitioner testified that she learned what a conspiracy is only once she was in prison. [Id. at 66-67]. Petitioner also admitted that she was guilty of the conspiracy offense. [Id. at 91].

At the conclusion of Petitioner's testimony, this Court asked Petitioner whether she had ever asked Mr. Grigsby what he meant when he told her that the Government was not going to use her prior conviction against her if she pleaded guilty. [Id. at 94]. Petitioner replied, "No, sir. I do not remember." [Id.].

## II.  DISCUSSION

### A.  Ineffective Assistance of Counsel Standard

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel. See U.S. CONST. art. VI. In order to challenge a conviction based on the ineffective assistance of counsel, a petitioner has the burden of establishing that: (1) defense counsel's performance was deficient, in that counsel's "representation fell below an objective standard of reasonableness" as measured by "prevailing professional norms," and (2) the petitioner was

prejudiced thereby, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

To establish deficient performance by counsel, a petitioner must overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. As the Strickland Court cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

Id. at 689 (citation omitted). In the end, to prevail on a claim of ineffective assistance, a petitioner has the burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Harrington v. Richter, 562 U.S. 86, 104 (2011) (quoting Strickland, 466 U.S. at 687).

The Supreme Court has long recognized that the right to effective assistance of counsel extends to the plea negotiation process. See Padilla

v. Kentucky, 559 U.S. 356, 373 (2010); McMann v. Richardson, 397 U.S. 759, 771 (1970). More recently, the Court endeavored to define the responsibilities and duties of counsel during plea negotiations in two seminal cases, Lafler v. Cooper, 132 S. Ct. 1376 (2012), and Missouri v. Frye, 132 S. Ct. 1399 (2012). In these cases, which were decided on the same day, the Court applied the well-established Strickland analysis to conclude that the right to effective assistance may be violated when counsel fails to give proper advice regarding the rejection of a plea offer, Lafler, 132 S. Ct. at 1384, or when counsel fails to communicate a formal plea offer, Frye, 132 S. Ct. at 1409.  The instant case presents the Court with the task of applying the rationale of Lafler to counsel's conduct in advising Petitioner regarding her decision to withdraw her assent to the Plea Agreement and instead proceed to trial.

### B.     Petitioner's Claim that Counsel Failed to Explain Plea Offer

The Supreme Court has acknowledged that defining the duties and responsibilities of defense counsel in plea negotiations is "a difficult question."  Frye, 132 S. Ct. at 1408.  The Court, however, has noted that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable ...."  Strickland, 466 U.S. at 688; see also Frye, 132 S. Ct. at 1408 (noting that

although "the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides"). With respect to advising clients as to whether to accept or reject a plea offer, the American Bar Association standards state that counsel should, after conducting an appropriate investigation, "advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision." ABA Standards for Criminal Justice Pleas of Guilty, Standard 14-3.2(b) (3d ed. 1999). Adequate representation with regard to a proposed guilty plea requires not only investigation and study of the evidence, but also a meaningful analysis of the defendant's potential sentencing exposure. Handley v. United States, 47 F. Supp. 3d 712, 717 (N.D. Ill. 2014) (quoting ABA Standards for Criminal Justice Pleas of Guilty, Commentary on Standard 14–3.2(b)).

Here, Petitioner has failed to present any competent evidence that Mr. Grigsby failed properly to advise her of the Government's plea offer or its consequences. During his testimony before this Court, Mr. Grigsby stated unequivocally that he repeatedly advised Petitioner of the 20-year mandatory-minimum term of imprisonment she faced if she chose to go to trial and was convicted. He also testified unequivocally that he advised

Petitioner that if she pleaded guilty she faced a mandatory-minimum term of 10 years, rather than 20 years. Mr. Grigsby testified that he spent a lot of time explaining the consequences of the Government's plea offer on the day he delivered the proposed agreement to Petitioner, noting that he drove from Washington, D.C. to Asheville solely for the purpose of counseling Petitioner about the plea offer and was not rushed because she was his only client in the area. Mr. Grigsby also testified that he was not informed that Petitioner has learning disabilities and that he discerned no problems with her ability to comprehend the advice he gave her as she decided whether or not to plead guilty. Mr. Grigsby's testimony was specific and consistent and evidenced his understanding of the scope of "conspiracy" under federal law and the sentencing consequences of the decision to accept or reject the Government's plea offer.

Petitioner testified that Mr. Grigsby placed a single sheet of paper purporting to be her plea agreement in front of her and asked her to sign without explaining its terms or the consequences of a guilty plea. Petitioner's testimony on this point, however, simply is not credible. While Petitioner claims that Mr. Grigsby did not provide any explanation of her potential plea, she acknowledged in response to this Court's questions at the evidentiary

hearing that she had been advised that the Government would not use her prior drug-trafficking conviction against her if she pleaded guilty.

In favor of her motion to vacate, Petitioner argues that the fact that she had signed the plea agreement constitutes evidence that she truly intended to plead guilty and that Mr. Grigsby provided deficient representation when he informed this Court at the aborted Rule 11 hearing that Petitioner had decided to withdraw her guilty plea and proceed to trial. This argument, however, is belied by Petitioner's claim that she never knew what was in the Plea Agreement at the time she signed the single page that was put before her to sign. This argument is also belied by the fact that Petitioner stood silent when Mr. Grigsby told the Court at the Rule 11 hearing that she wished to withdraw her plea and proceed to trial.

Petitioner also argues that her admission that she was guilty of the conspiracy offense supports her assertion that she always intended to plead guilty. This argument, however, is inconsistent with her assertions that she was unaware of the evidence against her until she went to trial and that she did not understand what constituted a conspiracy until she was imprisoned. It is also inconsistent with her repeated statements to her counsel denying any involvement in the conspiracy.

Petitioner further argues that "while there is no doubt that [Mr. Grigsby] is competent to understand the offered plea bargain and the consequences [to Petitioner] of a trial, there is no evidence to suggest that he explained those concepts to [Petitioner] sufficiently for her to understand them." [Doc. 40 at 8]. In fact, Petitioner testified at the evidentiary hearing that Mr. Grigsby failed to provide *any* explanation of the plea offer and its consequences before having Petitioner sign it. Contrary to Petitioner's claim, however, the Government presented competent proof through the testimony of Mr. Grigsby that he gave a detailed explanation of the plea offer and its consequences to Petitioner. Mr. Grigsby further testified that he was not aware of any comprehension difficulties that Petitioner had during his representation of her, and Petitioner admittedly asked no questions of Mr. Grigsby that would have prompted additional explanation. On these issues, the Court credits Mr. Grigsby's testimony.[8]

---

[8] Finally, Petitioner contends that "it is clear that Mr. Grigsby does not emphasize the importance of keeping his clients informed as to the details of their cases" [Doc. 40 at 8], citing in support of this argument various disciplinary proceedings currently pending against Mr. Grigsby in the District of Columbia arising from his representation of other clients in various civil matters in that jurisdiction. The Court has reviewed such records and finds them to have no relevance to the issues presented in the instant proceedings.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Petitioner has failed to demonstrate that Grigsby failed properly to advise her of the Government's plea offer or its consequences.   Accordingly, Petitioner's Motion to Vacate is denied and dismissed.

The Court finds that Petitioner has not made a substantial showing of a denial of a constitutional right.  See generally 28 U.S.C. § 2253(c)(2); see also Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong") (citing Slack v. McDaniel, 529 U.S. 473, 484-85 (2000)).  Petitioner has failed to demonstrate both that this Court's dispositive procedural rulings are debatable, and that the Motion to Vacate states a debatable claim of the denial of a constitutional right.   Slack v. McDaniel, 529 U.S. 473, 484-85 (2000).  As a result, the Court declines to issue a certificate of appealability. See Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts, 28 U.S.C. § 2255.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Government's Motion for Summary Judgment, as corrected [Docs. 14, 15] is **GRANTED**, and Petitioner's Motion to Vacate, Set Aside, or Correct Sentence filed pursuant to 28 U.S.C. § 2255 [Doc. 1] is **DENIED** and **DISMISSED**.

**IT IS FURTHER ORDERED** that the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: October 7, 2016

Martin Reidinger
United States District Judge